UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Case No. 1:21-cr-650 (RDM) |
| v. : | |
| : | |
| PAUL COLBATH, : | |
| : | |
| Defendant. : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Paul Colbath to three years' probation, to include three months of home detention, 60 hours of community service, and $500 in restitution.

I.  **Introduction**

The defendant, Paul Colbath, a 65-year-old construction technician from South Carolina, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars' of property damage.

Colbath pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building. As explained below, a sentence of three months of home detention is appropriate here because: (1) Colbath was aware of the potential for violence and property destruction because he entered the Capitol after hearing the sound of glass breaking ahead of him; (2) he helped press forward into the building only three minutes after the

door he was standing at had been breached; and (3) he allowed himself to be influenced by the bad conduct and words of other rioters.

The Court must also consider that Colbath's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed to delay the certification vote. Colbath's participation in a riot that halted the Congressional certification, combined with his role of helping the crowd advance into the Capitol Building, calls for the limited restraint on freedom of a period of home detention.

## II. Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid repetition, the government refers to the general summary of the attack on the U.S. Capitol. *See* Doc. 23. (Statement of Offense). As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to the defendant's conduct and behavior on January 6.

*Paul Colbath's Role in the January 6, 2021 Attack on the Capitol*

Paul Colbath traveled from South Carolina to Washington, D.C. to attend the "Stop the Steal" Rally at the Ellipse on January 6, 2021. After attending that rally, at approximately 12:45 p.m., Colbath walked to the U.S. Capitol.

While outside the Capitol Building, Colbath saw agitators in the crowd and saw rioters climb the scaffolding outside the building. Officers deployed chemical spray in an effort to control the crowd. At 1:41 p.m., Colbath texted his wife, "Wild. Tear Gas at Capitol."

Colbath nonetheless continued to approach the Capitol Building. As he approached, he saw a large line of law enforcement officers on the Upper West Terrace wearing helmets and face shields, including some with riot shields. Below is a screenshot of a video taken by Colbath:



At approximately 2:42 p.m., the Senate Fire Door was breached by a crowd of rioters after one rioter smashed the glass in the door and reached inside to open the door. The crowd quickly pushed past officers who fought to try to protect the door:



 

As Colbath later told the FBI, he heard the sound of glass breaking. In response to a member of crowd yelling for everyone to "Go!" he pushed forward toward the building entrance. He took a video of the crowd of people in front of him streaming into the building. While the video captures the frenzy of the crowd pressing into the building, it does not capture any violence against any officers:

4



At approximately 2:45 PM, Colbath entered the U.S. Capitol Building with a crowd through Senate Fire Door. Inside, he heard people chanting, "Our house!" The following screenshot captures Colbath, circled in orange, inside the Capitol:



While inside, Colbath saw a cloud of chemical spray and saw a rioter who had been affected by the spray. He ushered the man into a nearby meeting room to get fresh air. In the room, Colbath saw a broken window and signs of vandalism. Colbath exited the room after about 25 seconds and walked further into the Capitol Building. He then turned around and walked back to the threshold of the same door from which he had entered.

Colbath walked back into the building approximately 30 seconds later and walked down the same hallway. He exited the Capitol approximately five to six minutes after he first entered.

Colbath remained on the Capitol grounds for more than two hours after he exited the building. He was captured on Closed Circuit Video at 3:57 p.m., standing outside of another door, talking on the phone:



Colbath left the area shortly before 5:00 p.m.

Colbath has admitted that he knew when he entered the U.S. Capitol Building that that he did not have permission to do so.

*Paul Colbath's Interviews*

Colbath agreed to be interviewed by the FBI at his home on January 18, 2021. Colbath readily admitted to being at the Capitol on January 6, and to entering the building. He told the agents that it was a relief to admit this, and that he had become "caught up in the emotion" of the event. Colbath explained that he did not have the intent to "assault" the Capitol Building but was simply following the group of people around him. Colbath remembered hearing the sound of glass breaking, which he assumed was a window of the building about 100 yards away. When he heard a man yelling for the crowd to "Go! Go!" he "lost his head" and pushed forward.

7

Colbath said that when he first entered the Capitol Building, he was in a hallway and saw a cloud of what he believed was tear gas.  He saw a man near him who had been affected by the tear gas. He ushered the unidentified man into a nearby room to get fresh air. He stated that he saw a broken window and vandalism to the room. When he saw the clear signs of destruction, he knew that being in the Capitol building was wrong. Colbath likened seeing the destruction in the room to being hit with a "bucket of cold water" by God, and it instantly returned him to his senses.  He said he stayed in the Capitol for no more than five minutes.  Colbath said that he left the scene at approximately 4:56 p.m. and headed back to his hotel by 5:00 p.m. to avoid violating the recently announced curfew.

Colbath told the agents that he felt ashamed of his actions. He did not want to turn himself in because he did not believe he did anything criminal, but still felt guilt about his participation. He felt like he had made "a big mistake."  He said that he was willing to cooperate in any way.

Several days later, Colbath followed up with an email to the FBI agent stating that he wanted to take full responsibility for his actions and acknowledging that he had made a "colossal mistake":

> I was thinking about our conversation the other night and I feel like I left the impression I was blaming others for my actions. I am 100% responsible for my actions. Nobody made me do anything. I'm sure you probably think I'm trying to curry favor with you - I honestly don't know. What I do know is I have been unable to talk to anybody (except a little with my wife) and holding this in has really stressed me out. In a strange way, you are the only one I feel I can unburden myself to. I promise I won't be leaning on you anymore as a counselor!
> I made a colossal mistake and will never understand my actions that day.

Colbath agreed to be interviewed again on August 26, 2021.  His statement to the FBI agents was consistent with his previous interview, and he confirmed that he was the individual identified in a video and a photo in and around the U.S. Capitol on January 6.

On October 28, 2021, Colbath self-surrendered to the FBI. He voluntarily turned over his phone for the FBI to search. He initialed photos taken from CCTV video inside and outside the Capitol to indicate that he recognized himself.

*The Charges and Plea Agreement*

On October 20, 2021, Colbath was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and 40 U.S.C. §§ 5104(e)(2). On October 28, 2021, he self-surrendered. On October 29, 2021, Colbath was charged by four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). Colbath promptly indicated a desire to plead guilty. On January 10, 2022, he pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating or Picketing in the Capitol Building. By plea agreement, he agreed to pay $500 in restitution to the Department of the Treasury.

### III.   Statutory Penalties

Colbath now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, he faces up to six months of imprisonment, five years of probation and a fine of up to $5,000. He must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.   Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the

defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of a sentence of probation that includes a period of home detention.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also might have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while looking at the defendant's individual conduct, this Court should assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or

destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had Colbath personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on Colbath's part is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish Colbath from most other misdemeanor defendants.

In Colbath's case, as he approached the Capitol Building, he saw agitators in the crowd and saw rioters climb the scaffolding outside the building. He was aware that tear gas had been deployed. Colbath entered the Capitol building only three minutes after the Senate Fire Door had been breached by force. He had just heard the sound of glass breaking, which he believed to be a window of the building, and still he pushed forward, following a rioter's command to, "Go, Go!" Finally, once inside, even after witnessing the destruction and vandalism in one the rooms, he did not immediately exit, but went further inside, spending several more minutes before deciding to leave the building. This conduct undoubtedly contributed to the success of the overall effort to breach the U.S. Capitol by adding to the momentum of the crowd and to overwhelm and outnumber law enforcement officers protecting the building. On the other hand, Colbath stayed inside for only about five minutes, and part of that time involved helping another rioter who had been affected by chemical spray. Colbath also readily admitted his guilt, expressed substantial remorse, and offered cooperate with law enforcement any way he could.

### B. The History and Characteristics of the Defendant

Paul Colbath is a 65-year-old construction technician with no criminal history. The PSR reports a steady history of gainful employment for at least the past 17 years. PSR ¶ 61. Colbath also served in the military for three years in the 1970s. *Id*. ¶ 63. While Colbath's military service is laudable, he should have understood from that service the danger to the United States of rioters storming the Capitol building.

Colbath has also indicated his remorse for his involvement in the Capitol siege on multiple occasions. He also told the PSR writer that "not a day goes where he does not think about what happened on January 6, 2021, or regrets having gotten involved in the riot" and that "he has learned his lesson from the experience." PSR ¶ 29.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[1] This factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

---

[1] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was intended by many of the rioters to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As this Court noted during sentencing in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. As this Court previously explained, this was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future potential

13

rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Colbath's words and actions indicate sincere remorse. However, Colbath's description of how he "lost his head" after being inspired by someone waving an American flag, and that he pushed forward upon hearing a man's order to "Go!" are concerning. This explanation of what led him breach the Capitol is similar to that of many other individuals who were present that day and otherwise had no criminal history. Susceptibility to such influence, and even mob mentality, were essential ingredients to the Capitol siege. A sentence of home detention will help ensure that today's remorse and level-headedness will not fade during the next emotionally-charged mass gathering.

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[2] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A

---

[2] Attached to this sentencing memorandum is an Appendix providing additional information about the sentences imposed on other Capitol breach defendants, and showing that the requested sentence here would not result in unwarranted sentencing disparities.

probationary sentence should not become the default.[3] *See United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth).

The government and the sentencing courts have drawn meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

Colbath has pleaded guilty to Count Four of the Information, charging him with parading, picketing or demonstrating on Capitol grounds, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

---

[3] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long he remained inside, the nature of any statements she made (on social media or otherwise), whether he destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences. And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may also consider the sentence imposed in the following cases for reference.

In *United States v. Torrens*, the defendant spent about 10 minutes inside the Capitol, exited of his own accord, was not involved with any violence or property destruction, and had no criminal history. Upon arrest, the defendant voluntarily spoke with agents, was forthcoming about his conduct, and showed remorse. But video evidence showed the chaos that the defendant personally witnessed as his pushed forward onto the restricted grounds and into the Capitol, and the defendant acknowledged that he saw rioters throwing things at the police and spraying them with pepper spray. The government requested a sentence of two weeks incarcerations and $500 in restitution. The court sentenced Torrens to 36 months of probation to include three months of home detention as well as $500 in restitution. *See United States v. Torrens*, Case No. 1:21-CR-204-2-BAH.

In another comparable case, in *United States v. Reimler,* the defendant spent about 19 minutes inside the Capitol and exited of his own accord. Like Colbath, Reimler voluntarily spoke to FBI agents and admitted his presence in the building, acknowledging that he had seen metal barricades that had been pushed aside or knocked down. The government requested a sentence of 36 months of probation to include two months of home detention. This Court sentenced Reimler to 36 months of probation to include 30 days of home detention, as well as 60 hours of community service and $500 in restitution. *See United States v. Reimler*, Case No. 1:21-CR-239-RDM.

Similarly, in *United States v. Barnard*, the defendant spent about 15-20 minutes inside the building and was not involved with any violence or property destruction. Unlike Colbath, Barnard deleted evidence from his phone after learning that individuals had died during the Capitol siege. Like Colbath, Barnard also voluntarily cooperated with law enforcement and entered into a plea agreement at the first available opportunity. Significantly, Barnard came to the aid of a law enforcement officer inside the U.S. Capitol building when the scene turned violent inside the Crypt. The government requested a sentence of 36 months of probation to include 30 days of

17

home detention. The Court sentenced the defendant to 12 months of probation to include 30 days of home detention, as well as 60 hours of community service and $500 in restitution. *See United States v. Barnard*, Case No. 1:21-CR-235-RC.

Finally, in *United States v. Fitchett*, the defendant spent about 10 to 15 minutes inside the Capitol building with her friend, Douglas Sweet. They were both arrested by law enforcement officers in the Capitol Visitor Center corridor after rioters refused officers' commands to exit the building. Fitchett cooperated with law enforcement following her arrest, gave a voluntary interview with the FBI, and consented to a search of her cellphone. Like Colbath, Fitchett told investigators she got "caught up in the moment" and "made the wrong decisions, which led to a wrong . . . outcome . . . My actions were my own." Like Colbath, Fitchett continued to show remorse for her involvement in the Capitol siege. The government requested a sentence of 36 months of probation, to include two months of home detention. The Court sentenced the defendant to 36 months of probation, to include 30 days of home detention, as well as 60 hours of community service and $500 in restitution. *See United States v. Fitchett*, Case No. 1:21-CR-41-CJN.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an

18

appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

V.     **Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained above, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Paul Colbat to 36 months of probation, to include three months of home detention, 60 hours of community service and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing limited restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


By:     */s/ Alison B. Prout*
Alison B. Prout
Assistant United States Attorney
Georgia Bar No. 141666
75 Ted Turner Drive, SW
Atlanta, Georgia 30303
(404) 581-6000
alison.prout@usdoj.gov